## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **Jane Doe, as parent and natural guardian of John Doe, a minor** | : | **Civil Action No.** |
| | : | |
| **Plaintiff,** | : | **COMPLAINT AND JURY DEMAND** |
| | : | |
| -against- | : | |
| | : | |
| **Indian Mountain School, Amy Tedder and Jody Reilly Soja,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

Plaintiff Jane Doe, on behalf of her minor son John Doe,[1] by and through her attorneys Nesenoff & Miltenberg, LLP, as and for her complaint against Defendants Indian Mountain School, Amy Tedder and Jody Soja allege as follows:

### NATURE OF THE ACTION

1.      This action arises out of Defendants' actions and omissions, breaches of various agreements, negligence, defamation, disability and race discrimination and retaliation against John Doe ("John"), a 10-year-old boy with dyslexia and Attention Deficit Hyperactivity Disorder ("ADHD") who was forced out of his school and community, Indian Mountain School ("IMS").

2.      Prior to the start of the 2023-2024 school year, IMS allowed then Head of School, Jody Reilly Soja ("Soja"), to make a series of hiring and promotion decisions that directly impacted the wellbeing of John and students in his class. With the blessing of IMS's Board of Trustees, Soja hired or promoted at least four individuals who were unqualified or untrained for their positions, including i) John's teacher, "Teacher 1"; ii) Amy Tedder ("Tedder"), the Interim Head of Lower

---

[1] A motion to proceed by fictitious name has been simultaneously filed herewith.

School; iii) the Director of Admissions; and iv) the Interim Director of Diversity, Equity and Inclusion.

3.      Soja then failed to supervise or train these employees, though she was responsible for doing so.

4.      Soja's course of action in replacing key personnel with unqualified and untrained individuals violated fundamental and best practices employed by independent schools such as IMS and jeopardized the health and safety of IMS's students.

5.      During the 2023-2024 school year, John—a White, male student—was subjected to a months-long campaign of bullying and abuse for which he was disproportionately punished in comparison to female students and a student who is a person of color, in many instances being blamed for other students' actions against him and, on other occasions, being blamed for incidents in which he was not involved (and not even in the same location as where the incident took place).

6.      John's teacher and Tedder used John's dyslexia and ADHD diagnoses as a basis for attributing blame to John and singling him out for reprimand when, in fact, John was speaking up in response to being mistreated by others, expressing his needs or simply acting as a typical elementary school student.

7.      The chaos in John's classroom, and the teacher's open hostility to John and other students, became so prevalent that, in January 2024, John became despondent and fearful of attending school.

8.      Shortly after, John was accosted by another student, a person of color, on the playground. He responded to the aggression. At first, Defendants wrote the situation off as a mishap and a fairly normal occurrence between elementary school students. Soon after, they

fabricated a false narrative about John engaging in a pattern of "aggressive behavior" and threatened John with expulsion if his parents did not withdraw him from school.

9.      As a result of these continuing threats, and hardline approach to disciplinary issues that ***did not exist***, John's parents were forced to send him to a new school in February 2024.

10.      Tedder and Soja perpetuated the false narrative about John, even crafting a false and defamatory "progress report" that depicted John as needing support in various areas such as acting with integrity and being inclusive. It also portrayed him as a child who was constantly creating conflict with others—when others were routinely attacking him. This false and defamatory report is a permanent part of John's education record.

11.      At all times, Tedder and Soja were aware that John was suffering acute emotional distress and mental anguish, yet they doubled down on their plan to oust John from IMS under false pretenses. Their misconduct caused John to mistrust the very educators that are charged with his care, which has permanently altered his academic trajectory.

12.      Notably, John and his parents made several complaints during the course of the 2023-2024 school year about the disparate treatment that John was receiving as a White, male student with learning disabilities. John faced discrimination for every characteristic of his personhood.

## THE PARTIES

13.      Plaintiff Jane Doe is John Doe's mother. John, a minor, was a student at Indian Mountain School during the relevant time period.

14.      Defendant Indian Mountain School is a 501(c)(3) nonprofit corporation, licensed in the State of Connecticut and a primary school for Pre-K through Grade 9 in Lakeville, Connecticut.

15.     Defendant Amy Tedder is an employee of IMS. During the relevant time period, Tedder was the Interim Head of Lower School and then became the Head of Lower School for IMS's lower campus, where children from Pre-K through Grade 4 attend school. Tedder began working at IMS in 2022 and lacked the requisite experience for the Head of Lower School position. Tedder is currently employed at IMS.

16.     During the relevant time period Defendant Jody Reilly Soja was the Head of School for IMS (upper and lower campus). Soja left IMS on June 30, 2024. During the relevant time period, Soja was in the final stages of accepting a new, high-profile role at another independent school in Connecticut.

## JURISDICTION AND VENUE

17.     This Court's federal and supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 28 U.S.C. § 1367 because: (i) the case arises under the laws of the United States; (ii) this case asserts civil rights claims; and (iii) state law claims are so closely related to the federal law claims as to form the same case and controversy under Article III of the U.S. Constitution.

18.     This Court has personal jurisdiction over Defendants because they are conducting business, in the State of Connecticut.

19.     Venue for this action properly lies in this District pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to the claim occurred in this judicial district.

## FACTS RELEVANT TO ALL CLAIMS

### I.       Summary of the Case

20.     John is a 10-year-old boy who has dyslexia and ADHD.

21.     John attended IMS beginning in September 2020 and until February 23, 2024, when John's parents enrolled him at another school after IMS forced John's parents to withdraw him from school.

22.     During the time that John attended IMS he was enrolled in the school's "Ascend" program for students with dyslexia and learning-based language differences.

23.     The program was a key reason that John's parents sent him to IMS, a school that marketed itself as having specialized expertise in educating students diagnosed with dyslexia and learning-based language differences.

24.     During the 2023-2024 school year, IMS helped support a reward program for John that was devised and implemented by his parents and cognitive behavioral therapist to help John manage certain behaviors that stemmed from his ADHD.

25.     During the 2023-2024 school year, John was repeatedly bullied and harassed by fellow students.

26.     His teacher, Teacher 1,[2] Tedder and Soja blamed John for other students' misconduct, reprimanding John rather than the students who bullied him.

27.     Teacher 1 and Tedder frequently pointed to behaviors related to John's ADHD rather than John having a valid response to the actions of the other students.

28.     Other students in Teacher 1's class, including female students and a person of color, were all treated more favorably than John when it came to discipline.

29.     John was singled out for punishment while his teacher applied collective punishment for the infractions of other students.

---

[2] The identity of John's teacher, and certain other IMS employees, are being protected in this pleading to prevent John and other students, who are minors, from being identified.

30.     Despite facing bullying, harassment and retaliation, between October 2023 and January 2024, John received glowing reports about his progress and performance in school.

31.     He was described as an asset to his grade and Tedder was making plans with John's parents for the upcoming school year.

32.     Despite this glowing praise, IMS suddenly changed course and constructively expelled John, without any grounds for doing so, ***after*** John's parents complained to Tedder that John's teacher, Teacher 1, was compromising the emotional health of the students in John's class, including John, by acting in a manner that students described as consistently angry. Notably, John's parents were among the parents of at least four students (in a classroom of eleven students in total) to complain about Teacher 1's hostile demeanor in John's classroom.

33.     Rather than taking action to remedy the situation, mentor or discipline the teacher, IMS waged a hostile, deeply damaging, smear campaign against a 10-year old boy, culminating in Soja and Tedder fabricating a "pattern of behavior" that did not exist.

34.     Soja and Tedder also blamed John for ***his teacher's*** abusive and discriminatory behavior and inability to control other students who were unkind to Student A, the only person of color in John's class.

35.     Soja and Tedder retaliated and discriminated against John by using his learning disabilities as a means through which to fabricate the "pattern of behavior."

36.     They further discriminated against John by blaming him for an incident that was initiated by Student A.

37.     Prior to IMS's arbitrary, capricious, discriminatory and retaliatory acts against him, John was thriving at IMS. He was on track to graduate from IMS's Ascend program  by the end of the 2023-2024 school year—an accomplishment that was unprecedented.

38.     To add insult to injury, Tedder and Soja spread false and defamatory statements about John's "behavior" to the school community and to John's therapist (without his parents' consent to contact her).

39.     Tedder and Soja also conspired to defame John in a winter progress report—which remains part of his permanent education records—that falsely evidenced a complete backslide in John's "Social/Emotional", other academic skills and physical coordination skills.

40.     Tedder and Soja crafted the false winter progress report with the intention of harming John's reputation, to cover their failure to supervise John's teacher and discriminatory acts against John. They further misrepresented that the progress report had been authored by Teacher 1 and another IMS employee, "R. H."

41.     They also sought to hide the fact that Tedder had promised Student A's parents that John was leaving school. Notably, Student A's parents ***had not*** demanded that John leave IMS, nor had they pointed to John as a specific problem for Student A.

42.     The winter progress report left out all context for what had transpired in the classroom and with Student A.

43.     The winter progress report also failed to reflect the abundance of praise that John received in November 2023 through mid-January 2024. It further painted a picture of John as having disciplinary and academic problems which he simply did not have.

44.     The unconscionable mistreatment and retaliation John suffered at the hands of IMS, including biased employees Soja and Tedder, severely impacted his progress, caused him acute emotional and psychological distress and caused John to doubt that he could trust the adults that are supposed to care for him while he is at school and away from home.

45.     IMS, Soja and Tedder knew that their conduct was severely impacting John and doubled down on their campaign to force him out of school, even attempting to implement arbitrary and unfounded restrictions to John's reentry to the school at a later point in time.

46.     John has not returned to IMS and is presently continuing his education at a different school.

## II.     John Faces Discrimination and Retaliation

47.     John's progress during the 2023-2024 school year is a testimony to the boy's resilience.

48.     He made significant strides with his dyslexia and ADHD until the misconduct, bias and retaliation of IMS faculty and administrators caused John to develop an aversion to attending school, necessitated changes to his medication and caused the 10-year-old boy to have dark thoughts (such that his therapist worried he may harm himself), depression and suffer severe emotional and physical distress.

49.     From the beginning of the school year until John was forced to withdraw from IMS, he was bullied and attacked by peers and teachers. He was then blamed for speaking out against that bullying.

50.     John was also blamed for the misconduct of other students in his class.

51.     John's teacher, Teacher 1, created a hostile learning environment in which she discriminated and retaliated against John and blamed his ADHD for problems in the classroom.

52.     John's teacher singled John out for discipline and ignored his discrimination complaints.

53.     This discrimination and retaliation was fully supported by Tedder, who failed to adequately supervise or manage John's teacher, Teacher 1, who displayed open hostility towards the students in John's class.

54.     Tedder admitted the classroom was "in crisis" but said that Teacher 1 lacked confidence and could not take criticism. Tedder also told John's parents that she did not have experience managing employees who were older than she was.

55.     At all relevant times, Soja was aware that both Teacher 1 and Tedder lacked the competence and/or training necessary to ensuring a safe and healthy classroom environment for John and his peers.

56.     Soja disregarded warning after warning, preoccupied with landing a prestigious job at a new school (which she now has).

57.     Soja was also under tremendous pressure to diversify the student population at the lower campus, which was a "board level goal."

58.     During the previous year, Soja faced heavy criticism when the beloved Director of Diversity, Equity and Inclusion suddenly departed IMS and Soja replaced her with an individual who lacked specific training and experience for the role. As a current IMS employee, the new director was required to juggle his current position with the very important job of ensuring that IMS treated all students fairly and equally.

59.     Soja failed to supervise the new director, Tedder and Teacher 1 to ensure the equal treatment of all students on the lower campus.

**A.  IMS Treats Female Students More Favorably**

60.     On September 14, 2023, a female student in John's class attempted to bite him, leaving saliva on his arm.

61.     John got upset, looked at the "gender equality" and "safe space" posters on the walls of his classroom and told his teacher that the classroom was **not equal for boys**, or a safe space for him, because if a boy tried to bite a girl that the boy would get expelled.

62.     Rather than take action to correct the potentially harmful behavior of the female student, or hold a collective punishment discussion similar to that used when other children felt attacked or targeted, John's teacher, Teacher 1, sent a note home to his parents which portrayed **him** as misbehaving in class because he spoke up about inequality.

63.     John's teacher **did not** notify the parents of the female student about the incident.

64.     John's teacher falsely described the attempted biting as the female student "smearing saliva" on him. She further blamed John's sensitivity to "gender related things," and "feeling deeply" as the reason why he was upset by the assault.

65.     John's parents complained to Tedder about Teacher 1's misstatements about the incident.

66.     In response, Tedder initially suggested that John was being dishonest. She further expressed that she was uncomfortable questioning how the teacher handled the incident. Tedder said that John's teacher lacked confidence and would not be able to handle criticism.

67.     Only after John's parents made multiple requests to Tedder to look into what had happened, did Tedder investigate the situation and uncover **multiple sources** who **agreed** with John's recounting of what happened—that the female student tried to bite him.

68.     Though Tedder apologized for the discipline being focused on John, the damage had already been done—John was upset about returning to the classroom for fear of being blamed for something he did not do.

69.     John missed a full day of classes due to being upset but his parents encouraged him to return.

70.     When John returned to school, on September 18, 2023, a female student in John's class repeatedly elbowed him while sitting next to him on a rug. He told the teacher.

71.     John was reprimanded for a statement he made in response to the elbowing. Teacher 1 reported the incident to Tedder as John being "rude" to an adult, rather than a response to being elbowed.

72.     The female student, who had at least one point during the previous school year been on a school-mandated behavioral plan, was not reprimanded.

73.     At a subsequent meeting, John's mother told Soja about the biting incident and Teacher 1's decision to report John as rude but not report the incident to the female student's parents. John's mother also told Soja about two other serious incidents that she was directly aware of in which male students had been harassed by female and nonbinary students at IMS but were afraid to report the incidents for fear of being labeled sexist. One of the male students was physically injured and the other, male student suffered an academic impact.

74.     Soja's advice was that the male students should be more sensitive and understand the perspective of others.

**B.  IMS Teacher Calls John A "Dimwit"**

75.     During the first week in October 2023, John's math teacher, "Teacher 2," called John a "dimwit", which was profoundly upsetting to John (and, in all likelihood, other students).

76.     Teacher 2 knew that John is dyslexic which made the insult all the more reprehensible. For any teacher to call any student a "dimwit" would significantly impact that student's attitude toward learning and overall self-esteem.

11

77.     On October 9, 2023, Tedder suggested that John talk to the teacher or "find a way of coping with his annoyance" that his teacher referred to him as a dimwit, minimizing the gravity of what had occurred.

78.     Even in the case of being mistreated by a teacher, John was blamed and directed to "cope" with it.

79.     The teacher, Teacher 2, who had a long history of mistreating students and teachers, was not reprimanded for using an abusive term towards John.

80.     Tedder told John's parents that *he*, a 10-year old, was responsible for managing his relationships with his teachers—not only a teacher with disciplinary issues but also Teacher 1, who had been singling him out for unwarranted reprimands.

81.     Tedder further insinuated that she resented the accommodations IMS was making for John's ADHD. Her October 9 email to John's parents referred to a "special exception" made for John in which he was allowed to meet with his cognitive behavioral therapist during the time slotted for his art class.

**C.   John Is Bullied By Older Students**

82.     On October 20, 2023, John was bullied by students from IMS's upper campus at a family party held on campus.

83.     Four students, each between 3-5 years older than John, physically surrounded him and pressured him to say an offensive word that he would never and had never used.

84.     After John protested multiple times that he would not say the offensive word, one student involved, a person of color, told John that he could say the word because he was giving him a "word pass." This interaction referenced a norm that had emerged on the IMS campus that

IMS students who are persons of color could give "word passes" to White students to use the offensive word.

85.     Witnesses to the incident confirmed John's account of what happened and, after an investigation, the older boys were required to apologize to John. Their consequences did not include any lost school time.

86.     Tedder and the Assistant Head of School for Student Life confirmed to John's parents that he had done nothing wrong and handled the situation as best as a 10-year-old could have in John's situation.

87.     After John was forced out of IMS, the Assistant Head of School for Student Life suddenly suggested to John's parents that he should have been disciplined for what happened.

88.     This was part of a post-hoc, false narrative that IMS created to justify the arbitrary and unwarranted actions taken to force John to leave school.

89.     This change in position also post-dated negative publicity that IMS received concerning a teacher assaulting a student who is a person of color and a seventh-grade student, also a person of color, failing to return to IMS mid-year because she felt that she did not fit in.

**D.   Tedder Falsely Asserts That John Was Involved In A "Racial" Incident**

90.     On October 26, 2023, students in John's class were unkind to their fellow student, Student A, who is a person of color. Understandably, Student A was very upset.

91.     John ***was not involved*** in the incident. Nor was he even in the same area where the incident happened.

92.     John's teacher, Teacher 1, punished the entire class and cut their recess short.

93.     Several hours later, at an after school class, John said "thanks a lot," to Student A, because he was frustrated for being punished for an incident that he was not involved in.

94.     John's teacher reacted aggressively, pulled John out of the class and brought him to Tedder's office.

95.     Tedder then called John's mother and informed her that John was involved in a "racial" incident, when, again, John had **no involvement** in the earlier incident at recess and was merely frustrated at the collective punishment imposed by the teacher.

96.     From the start of the school year, Student A had a history of being disruptive in the classroom.

97.     From the start of the school year, John's teacher, Teacher 1, implemented a collective punishment process called "Ubuntu" in which the entire class was asked to stop what they were doing and gather to discuss any situation in which an individual student felt hurt or failed to follow the rules.

98.     The collective punishment approach implemented by Teacher 1 did not comply with IMS's policies for disciplining students. Tedder acknowledged this to several concerned parents.

99.     Throughout the fall, a trend emerged that many of these sessions were either caused by Student A's disruptions or Student A's tendency to "tattle" on the actions of other students.

100.     This troubled the other students, including John, who felt blamed for the actions of Student A.

101.     John was very aware that in the instance in which he had been upset (when a girl in the classroom tried to bite him), an "Ubuntu" session had not been implemented.

102.     Following the events of October 26th, Tedder and Teacher 1 singled out John and his two friends for being "unkind" to Student A, meeting with them on a daily basis either as a

group or individually to quantify the number of times each day that they were kind or unkind to Student A.

103.    There was an automatic assumption on the part of John's teacher and Tedder that the exclusivity of John's friend group was related to Student A being a person of color – when Student A's disruptive behavior and the Ubuntu collective punishment was causing the students in class to be apprehensive about interacting with Student A and frustrated with the classroom environment in general.

104.    Tedder routinely referred to the elementary school-level behavior of White students, including John, as racist when there was **no evidence** that this was the case.

### E.  John's Teacher Targets Him For Individual Punishment

105.    On October 30, 2023, during the time in which conversations were happening with John's parents and the parents of two other male students in John's class about their interactions with Student A, John's teacher, Teacher 1, implemented a new behavioral plan, **exclusively for** John for being "disruptive" in class. The plan was to banish John to the hallway on occasions in which he was being "disruptive."

106.    The teacher did not implement this plan as a means of dealing with "disruptive" students generally, including Student A—it only applied to John.

107.    The teacher was aware that as a result of his ADHD, John could occasionally address adults in an overly direct way that could be perceived as rude, and used that against him.

108.    The teacher implemented this plan after John and his parents disagreed with the teacher's complaint that John was deliberately excluding Student A from activities with John and his friends and disagreed with the accusation that this was racially driven.

109.    There was no basis for John's teacher to describe his general behavior in the classroom as disruptive.

110.    On the day after Teacher 1 tried to implement the new plan targeting John she took a brief leave of absence.

111.    Prior to October 30, 2023, John received glowing reports from his teacher and Tedder about his progress and good behavior:

   a.  On October 12, 2023, John's teacher, Teacher 1, effusively shared with his parents that John was a wonderful student who exhibited no behavioral issues in the classroom.

   b.  On October 16, 2023, John's teacher wrote, among other laudatory comments, that he "has made so much progress this year, we are very proud of him and love having him as a member of the [] grade."

   c.  On October 25, 2023: Tedder spoke with John therapist and reported consistently good behavior.

   d.  On October 26, 2023: Tedder wrote that John's "support system is working" and should be scaled back because of "how well he's starting to apply his coping skills independently."

   e.  On October 27, 2023: John received a classroom kindness card and his teacher praised his behavior.

112.    Based on the above-stated facts, the new behavioral plan for John was completely unwarranted and there was no reasonable basis for it.

113.    John's teacher, Teacher 1, retaliated against John, and used his disability as a means of doing so, because John objected to and disagreed with the narrative of exclusion—and singling out of John and his friends—after Student A complained.

114.    On November 2, 2023, John's mother met with Tedder and John's cognitive behavioral therapist about John's reaction to the October 26th events.

115.    At the meeting, Tedder described John's teacher, Teacher 1, as "in a bad place" and overwhelmed by the classroom situation.

116.    At the meeting, Tedder expressed being overwhelmed by her responsibilities as the Interim Head of Lower School. Tedder stated that she had never managed people who were older than her (referring to Teacher 1) and was finding it difficult.

117.    At the meeting, Tedder also said that she had not found a way to effectively communicate with Student A's parents.

118.    John's teacher, Teacher 1, was never prohibited from targeting John by sending him out into the hallway.

119.    In early November 2023, when Teacher 1 returned from her leave, Tedder told her to stop imposing collective punishment on her students because it was against IMS's policies.

**F.   Tedder Mischaracterizes John's Request For Help As "Rude"**

120.    On November 6, 2023, Tedder reported to John's parents that John had been "rude" to his Spanish teacher. In fact, John had expressed a need for a particular teaching approach due to his dyslexia.

121.    John's parents subsequently spoke with John's Ascend tutor who expressed surprise that John had been placed in a Spanish class in the first place, given his language-based learning disability.

**G.  John Is Blamed For Aggression By Another Student**

122.    On or about November 7, 2023, during recess, a male student grabbed John in a bear-hug style move inside the playground equipment shed in an attempt to get a soccer ball that John was holding.

123.    John reflexively **told** the boy (who was much larger in physical stature) that he would punch him. John took no physical action against the boy. The student complained about feeling bullied.

124.    Tedder made John meet with her to discuss the incident and apologize to the boy through the IMS "restorative justice" program. Once again, the aggressive behavior of the other student towards John was minimized.

125.    In an email to John's parents, Tedder referenced John's "behavior plan," relating the issue to John's ADHD rather than the other student's physical aggression. IMS implemented no "behavior plan"—a reward program was implemented and recommended by John's parents and cognitive behavioral therapist.

### III.    John Makes Great Strides Despite Hostile Learning Environment

126.    On January 10, 2024, the head of the Ascend program told John's mother that John had made such significant progress in managing his dyslexia that he was graduating from the Ascend program at the end of the school year. Tedder was aware of, and supported John's graduation from the program, and reiterated this to John's mother directly on January 11, 2024. This level of progress was **unprecedented**.

127.    On January 11, 2024, Tedder suggested that the reward program that was in place for John (as recommended by his parents and cognitive behavioral therapist) was **no longer necessary** because of the progress that John had made.

128.    Though John prevailed over the hostile learning environment that he was immersed in during Fall 2023, by making significant progress and exhibiting predominantly positive behavior, the constant fighting to be heard and treated fairly and equally was taking its emotional

toll on him. John became resistant to attending school and frustrated that the chaos in the classroom was detracting from academic work, which he enjoyed.

129.    John further expressed that he did not like school, a huge change for a child who finished the prior school year declaring that he loved school.

130.    John was also increasingly wary of interactions with adults at IMS for fear of getting blamed for the actions of other students.

131.    John's parents made the decision to decrease his classroom time. John's ADHD medication was also increased to assist him with handling the hostile classroom environment.

132.    John's mother relayed this information to Tedder at a meeting on January 11, 2024. She also told Tedder that the negative emotions John was experiencing was a direct result of IMS's selective enforcement of its rules and policies against John, and assumptions made by Tedder and John's teacher that his attempts to navigate a tumultuous classroom environment with Student A's regular disruptions, were racially motivated.

133.    Tedder did not respond to this complaint.

134.    On January 15, 2024, John's teacher, Teacher 1, told him that the reward program that had been in place during Fall 2023, consisting of regular check ins with Tedder, was now optional. This was relayed to his mother with a note that said "we are proud of his progress." Teacher 1 also gave the update to John directly and told him that he had done a great job.

## IV.    Tedder and Soja Fabricate A False Narrative and Force John's Parents to Withdraw Him From School

135.    On January 18, 2024, John came home from school despondent. He told his parents that the teacher had been very angry at his class throughout the day although the students were not "being bad."

136.    On the same day, John's parents complained to Tedder about the teacher's conduct and expressed concerns that John's classroom was not a mentally healthy learning environment. John's parents further stated that they would be removing John from the classroom unless steps were taken to remedy the problem, which had been ongoing since the start of the school year.

137.    On January 19, 2024, Tedder met with John's teacher, Teacher 1 She subsequently relayed the complaint made by John's parents to Soja.

138.    John's teacher denied that there was an issue with her teaching. As relayed to John's parents in a January 21 email, Teacher 1:

> was surprised and concerned about [John's] take and mentioned that while the class on the whole had a tough day (lots of disruption, side conversation, difficulty staying on task) she noted [John] trying to help redirect his classmates back on task and recognized him for this positive leadership.

139.    Once again, the adults charged with ensuring John's health and safety were calling upon him—a 10-year-old boy—to manage the classroom environment.

140.    On the same day, John's mother wrote to Tedder that "this is an image of a child who knows that if everyone doesn't fall in line, the adult in charge will get angry with everyone. This is not an environment where the child is thinking about reading or math or science, they are thinking about how to keep the adult from getting angry. This is not a mentally healthy learning environment, and we aren't comfortable with our child in this classroom without more adult direction."

141.    In response, Tedder did an about face, pointing to John as the source of problems in the classroom and recommended bringing John's cognitive behavioral therapist into the loop.

142.    On January 23, 2024, while the students were outside sledding for recess, Student A slammed his sled into two female students, breaking a safety rule. No action was taken against Student A though a teacher witnessed the incident. John saw this happen.

143.    Minutes later, Student A, slammed his sled into John and his two friends. One of John's friends was injured. In response, John kicked Student A.

144.    The teacher supervising recess, who had seen both incidents, sent John to speak to Tedder.

145.    Student A was not called in to speak with Tedder until after John informed Tedder that Student A had also broken a safety rule and expressed frustration that only he had been sent inside. Only then did Tedder call Student A into her office.

146.    John and Student A rightfully had their sledding privileges revoked for the rest of the day for each breaking a school rule.

147.    On January 23, 2024, Tedder spoke with John's psychiatrist and referred to the sledding mishap as an example of the day-to-day challenging dynamics in John's class, but did not highlight it as an episode of any significance.

148.    On the same day, Tedder reported the event to John's parents as a "mishap." She further agreed that it was the type of event that might occur between two children at recess.

149.    When reporting to John's parents, Tedder reported only the loss of John's sledding privileges for the day, and did not flag any behavioral issues or give any warnings to John or his parents.

150.    Later the same day, after speaking with Student A's parents, Tedder spoke with John's mother, and told her "we are in crisis, we need to do something" and relayed that Student A's mother had complained about him having a tough year when Tedder had called to report the loss of her son's sledding privileges.

151.    In response, John's mother told Tedder that John also had a tough year—including his parents choosing to decrease his classroom time and his psychiatrist increasing his medication

specifically to handle the chaotic classroom environment, but that those concerns had not been responded to as a crisis. She told Tedder that IMS should not prioritize one child's education and experience over another.

152.    In response, Tedder said "I probably shouldn't have told you that," referring to the demand from Student A's parent that the school "do something" about their son's tough year.

153.    During the same conversation, Tedder **blamed** John for negative interactions that John's **friends** had with Student A. At the same time, Tedder admitted that John, himself, **discouraged** his friends from being mean to Student A.

154.    Tedder acknowledged to John's mother that Teacher 1 needed more classroom management skills.

155.    On January 24, 2024, Tedder suddenly told John's cognitive behavioral therapist that IMS **could not support** John. Tedder attributed this conclusion to John's mental health—she made no mention of any behavioral issues. The conversation with the therapist was meant to be about classroom dynamics, not John specifically, as John's parents had not given Tedder permission to speak with the therapist specifically about John. With regard to these classroom dynamics, Tedder represented that John's classroom—which she proclaimed to be "in crisis" the day before—was "sound and organized."

156.    John's cognitive behavioral therapist told Tedder that to remove him from IMS would not be good for John's psychological or emotional health.

157.    The allegation that IMS could not support John was a complete fabrication, as evidenced by the fact that Tedder, herself, had praised John's progress a mere two weeks prior during discussions about John's progress and the plan for his education **the following year** at IMS's upper campus.

158.    On January 25, 2024, Tedder and Soja mischaracterized previous conversations with John's parents as a request that a second teacher be assigned to John's classroom. They further stated "We recognize that the current set up is not working for [John] and would like to discuss next steps, particularly since you expressed a possible decision to withdraw [John] if this support was not added."

159.    John's parents did not request that a second teacher be added to John's classroom. John's parents raised a general concern about the classroom environment, which Tedder then defined back to them as the school's responsibility to provide "mental safety" in John's classroom. In response, and now familiar with the term, John's parents requested an assurance of mental safety in the classroom for John and asked Tedder to work within IMS to ensure that the behavior of John's teacher was redirected so that the children in John's class, John included, were not dealing with her constant anger and inability to manage the class. John's mother suggested the presence of another adult to monitor classroom dynamics as one possible solution.

160.    On January 26, 2024—despite months of positive reports and praise about John's progress, and repeated incidents of John being bullied by other students—Tedder suddenly pointed to John's "issues with challenging behavior/classroom conduct" and said that IMS "was unable to meet [John's] needs." Once again, this was a complete fabrication.

161.    Tedder failed to disclose that she had already told Student A's parents that John was leaving IMS.

162.    Tedder, and Soja, further blamed John's emotional distress—caused by the pattern of bullying and retaliation against him at IMS—on John's learning disabilities as opposed to the hostile environment that was fostered by IMS and Tedder over the course of the 2023-2024 school year.

163.    Upon information and belief, no similar statements were made to Student A's parents about his history of disruptive incidents inside and outside the classroom.

164.    Student A continued to attend IMS after John's parents were forced to withdraw him from school.

165.    Other students in John's class who exhibited discourteous behavior to Student A, and to others, also remained in the class without their enrollment being threatened by Tedder or Soja. Those children do not have dyslexia or ADHD.

166.    On January 29, 2024—after it was clear that John's parents did not want to remove John from school—Soja and Tedder sent an email to John's parents about an "incident" that happened on or about January 26 in which John was annoyed that he was accused of a "double dribble," postured, or chest bumped, his friend (something they did when they played together outside of school) and was benched. John and his friends then chanted "wimp, wimp, wimp" at the students who accused John of double dribbling.

167.    This written communication, days after the incident, was a departure from Tedder's usual practice of calling parents about any issues that arose during the school day the afternoon of the incident.

168.    In the email, Tedder and Soja brought up the January 23 "sledding incident" (previously referred to by Tedder as a "mishap") and "all the interventions for [John] thus far," clearly trying to back up IMS's false assertion that they could not accommodate John's needs. The email further blamed John for the conduct of his friends in chanting at the other students during the basketball game and "leading" the boys to do so.

169.    Emails to the parents of the other two students involved in chanting at the basketball game were worded very differently and left out all reference to John "leading" them in the chant.

The uncharacteristic nature of the email in contrast to Tedder's standard communications was so striking that one parent who received it referred to it as a "legal email."

170.    On January 31 and February 1, 2024, John's mother asked to speak with Soja who had a number of facts wrong. Soja refused the requests.

171.    On February 1, 2024, a meeting was ultimately held with John's parents, Tedder and Soja at which Tedder and Soja—falsely and for the first time—accused John of a pattern of "physical aggression."

172.    Soja showed a lack of familiarity with the events purportedly comprising this "pattern." She brought up an incident from the ***2022-2023 school year*** that had been resolved immediately without any suggestion that it was a cause for concern.

173.    At no point during either the 2022-2023 school year or the 2023-2024 school year did John receive a behavioral contract, nor was he placed on probation.

174.    At the meeting, Soja incorrectly stated that John was on probation during the previous school year, showing her lack of familiarity with the situation.

175.    Tedder and Soja further stated that IMS was unwilling to offer John a contract to enroll for the next school year and "could reevaluate" that decision in June 2024.

176.    Tedder and Soja told John's parents that they should expect John to be expelled if he continued at IMS and had any further behavioral issues including use of a rude tone to an adult, to be determined in Tedder's judgment. They recommended that John's parents withdraw him from school.

177.    Notably, as set forth above, several students exhibited actual, physical aggression against John throughout the 2023-2024 school year—including attempted biting, elbowing, a restraining bear hug and being slammed with a sled—and were not asked to leave school.

178.    On February 9, 2024, John's parents conferred with his cognitive behavioral therapist who recommended that John continue his education at IMS because separation from his beloved community of four years, from his best friends and from his Ascend tutor would be devastating. The therapist agreed to meet with John multiple times a week before the start of the school day to prepare him for the adversity he may face in the classroom environment.

179.    John's parents kept him home from school on February 2, 2024 through February 12, 2024, though this only amounted to missing two academic days.

180.    On February 12, 2024, John's parents notified Tedder and Soja that they had decided that John should continue at IMS. They noted that they were working with his cognitive behavioral therapist on certain aspects of John's behavior that were caused by his ADHD (which were exacerbated by the emotional distress caused by the hostile learning environment created by John's teacher and the ceaseless bullying by his peers). They anticipated John's return to school the week of February 26th.

181.    On February 12, 2024, John's cognitive behavioral therapist met with him and noted that John's exclusion from IMS was taking an extreme emotional toll. She advised John's parents to monitor his physical safety in the event that he tried to harm himself.

182.    On the same day, February 12, 2024, John's psychiatrist prescribed medication to manage John's episodic anxiety and depression that had emerged since he had learned of the choice the school had given his parents at the February 1 meeting.

183.    On February 13, 2024, Tedder contacted John's cognitive behavioral therapist by email against the explicit instruction of John's parents ***not to contact her***. This message was forwarded to a member of IMS's Board of Trustees flagging that Tedder did not have permission to contact the therapist.

26

184.    On February 13, 2024, Tedder informed John's therapist by email that John's return to school was not set up for success and that an immediate expulsion was likely. John's therapist shared the email with John's parents. Due to the threatening nature of Tedder's comments about John's expulsion from IMS, his parents took steps to enroll him in a new school.

185.    On February 22, 2024, John's parents met with Soja and the Assistant Head of School for Student Life to discuss various facts that disproved that John had an engaged in a "pattern of physical aggression" and to share the physical notebook used in the reward plan which showed that the "pattern of rudeness" had no basis. The Assistant Head of School for Student Life was asked to attend this meeting as an observer.

186.    Soja admitted that she was not aware of these facts or of the evidence that John's parents provided, and that Tedder had not shared the existence of the notebook and its daily record with her.

187.    At the meeting, John's parents stated that John would be enrolling in a new school and asked for the school's assistance in helping to make this happen quickly. They asked Soja to send them all documents that would be released to the new school.

188.    On the same day, John's father discussed the meeting, the evidence, and Soja's lack of awareness of the evidence with a member of IMS's Board of Trustees. This trustee discussed possible re-enrollment options for John for the 2024-2025 school year and subsequent years. Soja was to contact John's parents with options.

189.    On February 23, 2024, Soja transmitted a winter progress report to John's parents as they requested to see all documents that would be sent to John's new school.  Completely unlike past reports (including the glowing praise that John received in mid-January 2024), the winter report falsely stated that John needed support for his ADHD which he did not need; blamed John

for having conflicts with other students and portrayed him in a negative light; and reported a backslide in all assessments of John as a student.

190.    Upon information and belief, and based on Soja's statements to John's parents, Tedder wrote the winter progress report in an effort to create a paper trail of negative behavior when none previously existed.

191.    The false and defamatory winter report remains a part of John's educational records and has the potential to impact his future education opportunities. John's parents have asked that it be rescinded but IMS insisted that a hard copy be retained in their records.

192.    Notably, the winter report spans the period of November 28, 2023-March 1, 2024. John did not attend class from January 26, 2024 through the month of February 2024. He consistently received positive reports through January 21, 2024 as set forth above – including graduating from the Ascend program and not needing to rely on the reward plan program that had been implemented by his parents in the Fall. The January 23, 2024 sledding dispute between Student A and John was reported as a mishap.

193.    On February 23, 2024, John's parents sent a draft letter to Soja with terms of re-enrollment for John, including a "clean slate" upon any return to IMS in the future. They further requested that John have tapered off time with his Ascend program tutor and a restorative justice session with Tedder (which John's therapist believed was critical).

194.    On February 26, 2024, John started attending a new school.

195.    On February 26, 2024, John's tutor from the Ascend program (an IMS employee) told an educational consultant that was assisting with placement in John's new school that John was asked to leave IMS due to his actions.

196.    On February 28, 2024, Soja informed John's parents that she would not sign the draft letter. IMS imposed conditions on the re-enrollment that Soja had offered on February 23, 2024.

197.    Per Soja, IMS would have the right to expel John if he "continued to exhibit aggressive or other inappropriate behavior," ignoring that, if he returned, John would be a student on the upper campus and subject to certain procedural protections set forth in the Parent/Student Handbook. Moreover, Soja's email once again exaggerated and misstated John's conduct record.

198.    Soja's February 28, 2024 email further threatened to take action against John if John's parents disagreed with IMS's policies or procedures in the future, noting "[w]e hope that you trust that IMS has acted in the best interest of all of its students, including [John]. If you do not, then it is probably prudent not to seek [John's] re-enrollment at IMS."

199.    Since February 26, 2024, John has been attending a new school. He will attend that school for the 2024-2025 school year.

200.    John has not recovered from the acute trauma caused by the bullying, retaliation and discrimination he suffered at IMS or, most significantly, his abrupt departure from his school, friends and Ascend tutor.

201.    As recently as July 15, 2024 John was bullied by IMS students—from the lower campus and upper campus—at a community camp. They mocked John for being expelled from IMS (which is not true). An IMS parent, who now teaches at IMS, also made false statements about John and his behavior at IMS to a coach at the camp.

202.    John suffers from depression and anxiety and extreme feelings of negative self-worth. He feels rejected and betrayed by the adults who were supposed to care for him at school. Instead, they targeted him and forced his departure. As a result of his mistrust of educators, and

low self-esteem, his academic trajectory has been upended, certain symptoms related to his learning disabilities have recurred and John is on an entirely different life course than when he started the 2023-2024 school year.

## V.    IMS Breached Its Agreements With Plaintiff

### A.    The Re-Enrollment Contract

203.    On June 13, 2023, John's father entered into a 2023-2034 re-enrollment contract with IMS which included terms and conditions for John's enrollment for the 2023-2024 school year.

204.    According to the enrollment contract, IMS could require the "immediate withdrawal, expel…and/or not re-enroll" a student in cases where: 1) a student violated a "major school rule"; 2) a student had "major academic problems"; or 3) if IMS determined that a student's "presence in the School is not in the best interest of the School." Enrollment Agmt., at p. 2.

205.    At no point during John's attendance at IMS were he or his parents ever told that he violated a "major school rule."

206.    On the contrary, the incidents that Tedder and Soja attempted to use to fabricate "a pattern of aggressive behavior" were resolved informally and characterized as justified and/or a "mishap" within the normal range of behaviors of elementary age children.

207.    Nor was John found to have "academic problems." On the contrary, his progress was praised and he was described as a valued member of his grade, receiving positive progress reports until Tedder's creation of the false and defamatory winter progress report immediately prior to John's departure from IMS.

208.    Nor did IMS find that John's presence in the School was not in the best interest of the School.

209.   On the contrary, John's teacher, Teacher 1, told his parents "we are very proud of him and love having him as a member of [his] grade."

210.   Tedder was actively planning John's next school year, including his graduation from the Ascend program.

211.   In January 2024, both Tedder and Teacher 1 said that John no longer needed to do weekly check ins as part of the behavioral program recommended by his parents and cognitive behavioral therapist.

212.   According to the enrollment contract, IMS could also require a student to withdraw if IMS determined it was "unable to reasonably accommodate the student's medical or mental impairment or condition(s)." Enrollment Agmt., at p. 3.

213.   While Tedder claimed that IMS could not "support" John due to his "mental health," there was absolutely no evidence that this was the case. John's parents came up with a plan in conjunction with his cognitive behavioral therapist and psychiatrist that would have allowed John to continue at IMS without any effort required on the part of IMS administrators. Nor did it require any accommodations. Prior to Tedder's attempted fabrication of behavioral problems, she was praising John's progress and behavior.

214.   The enrollment contract also provided that IMS could take action against a student, or his family (or both), for violations of the Student and Parent Handbook or any other School policy. Enrollment Agmt., at p. 4. In such a case, IMS could: 1) issue a written or verbal warning to cease the violation; or 2) dis-enroll or not re-enroll a student if IMS concluded that (a) the action of the student or a family member made a "positive and constructive relationship" impossible; (b) the action of the student or family member "seriously interfered" with the School's accomplishment of its educational purpose; or (c) the "student or family member has not worked

with School personnel in a cooperative spirit to support the needs of the student." Enrollment Agmt., at p. 4.

215.    In John's case, he was never found to have violated a school policy, as set forth above. Nor were his parents.

216.    John's parents worked positively and constructively with IMS up until the time that IMS stated that it did not intend to offer John an enrollment contract for the upcoming school year.

217.    John's parents did nothing but work with IMS to support John's needs, as demonstrated by his progress over the course of the 2023-2024 school year. Accordingly, there were no grounds for IMS to withdraw John's right to re-enroll for the upcoming school year.

**B.   The Student and Parent Handbook**

218.    IMS's Student and Parent Handbook contains a "DEI Mission Statement" which states the following community principles: i) identifying and addressing bias; ii) honoring qualities of justice; iii) actively listening to the experiences of others; and iv) valuing the dignity of all. *Id.* at p. 8.

219.    Members of the IMS community "commit to assessing their own implicit biases in order to prevent individual acts of discrimination."

220.    IMS's Student and Parent Handbook states that IMS "is enriched by the diversity of its members. The School recognizes and respects individual differences and backgrounds in regard to culture, race, ethnic origin, religion, gender, body type, and sexual orientation." *Id.* at p. 15.

221.    The Handbook further prohibits bullying and harassment, including "language…that attack[s] or dehumanizes others on the basis of race…gender…(dis)ability." The rule applies to all students and employees. *Id.*

32

222.    Students are also prohibited from engaging in "abusive behavior" towards others. *Id.*

223.    IMS breached the Student and Parent Handbook by permitting the repeated bullying and harassment of John by various students throughout the 2023-2024 school year.

224.    IMS faculty and administrators demonstrated implicit and explicit bias against John as a white, male student with learning disabilities when they treated female students, Student A, and students without learning disabilities more favorably than John and disciplined John for the other students' abusive behavior towards him.

225.    John's teacher, Teacher 1, created a hostile environment for John by openly discriminating and retaliating against him on the basis of his gender and learning disabilities.

226.    Tedder also discriminated against John by using aspects of his ADHD diagnosis as a basis for fabricating a reason to force John's parents to withdraw him from school.

227.    Tedder altogether failed to value John's dignity and dehumanized him by treating aspects of his ADHD diagnosis as sudden, major rule violations which IMS suddenly could not accommodate—a complete reversal from the glowing reviews and progress he made just weeks prior to Student A assaulting John and his friends with his sled.

228.    Teacher 2, called John, a dyslexic student, a "dimwit" in class, which created a hostile learning environment for John and the students in his class.

229.    The 2023-2024 Student and Parent Handbook states the following in regard to students in Pre-K through Grade 4 who attend school on IMS's Lower Campus:

> On the Lower Campus, minor infractions are managed by individual teachers. Major infractions or repeated minor infractions are managed by the Head of the Lower School who, in conjunction with the teachers, determines a course of action. The Head of School is consulted with an involved in any decisions that result in loss of school time. *Id.* at p. 16.

230.    The Student and Parent Handbook further states:

In the event that a student's behavior requires significant guidance and redirection, behavior contracts will be written and signed by the student and Assistant Head of School for Student Life with the intention of clearly outlining terms of acceptable and appropriate behavior for a probationary period of time. *Id.* at p. 17.

231.    IMS breached this provision of the Student and Parent Handbook because at no point in time was John provided with a behavior contract, nor was such a contract ever signed.

232.    John was never placed on probation.

233.    Instead, Tedder and Soja acted in bad faith to devise their own baseless disciplinary measure of having John face possible expulsion for "aggressive" behavior or quietly withdraw from school.

## VI.    IMS Failed To Oversee and Supervise Its Employees

234.    As Head of School, Soja oversaw hiring decisions and was responsible for supervising employees at IMS's upper and lower campuses, including Tedder.

235.    Soja was charged with ensuring that IMS employees in leadership roles (whether new hires or promoted from within) had the experience necessary to carry out their duties. She was also responsible for ensuring that all employees received the necessary training to meet the needs of the IMS community.

236.    The "Principles of Good Practice" of the National Association of Independent Schools ("NAIS"), of which IMS is a member, state that the Head of School: i) is "responsible for attracting, retaining, developing, and evaluating qualified faculty and staff;" ii) "oversees the shaping of the school's program and the quality of life in the school community"; and iii) "ensures that every element of school life reflects the principles of equity, justice and the dignity of each individual."

237.    Soja, with the assistance of IMS's Board of Trustees, mismanaged IMS by hiring and promoting key personnel who lacked the necessary training and experience for their roles.

238.    Soja further failed to provide necessary training and development opportunities to the individuals she hired and/or promoted in order to insure the physical and emotional health, safety and dignity of IMS's students.

239.    This had a direct and foreseeable impact on John.

**A.  "Filling Seats" Trumped the Needs of Each Student**

240.    Soja promoted an IMS employee to the role of Director of Admissions who would follow her agenda of filling seats rather than taking into account the needs of the students. The new Director was appointed without running a competitive process or ensuring that he had the proper training and experience.

241.    The metric that the Director primarily reported on to the Board of Trustees was on seats filled (and beds filled, regarding boarders). The perpetual under-enrollment of John's class year was an issue in a school that was waitlisted for almost every other class. This created pressure to fill that class even when timing didn't allow for a thorough screening process or when students' ages fell outside the standard band for the class.

242.    Student A was a full year younger than the other boys in John's class. He was enrolled in John's class for the 2023-2024 school year because the Director of Admissions wanted to fill the seats in John's class year.

**B.  IMS Hired An Unqualified Head of Lower School**

243.    In early 2023, the highly competent and experienced Head of Lower School offered Soja ideas in support of the school's new strategic goals. Soja expressed disinterest and scolded

the more experienced educator for stepping out of her lane. Soja then encouraged, and readily accepted the Head of Lower School's resignation, making no effort to retain her.

244.    In April 2023, Soja announced that the former Head of Lower School (who had nearly 40 years of experience) would be replaced by Tedder (who had three years of teaching experience in an accredited school). Tedder's appointment to this role came without a competitive hiring process.

245.    Tedder was unqualified for the role of Head of Lower School and received no training, including with respect to leading a campus with an integrated dyslexia program.

246.    Despite Tedder's lack of experience, Soja failed to allocate sufficient time and attention to the lower campus and supervising Tedder.

247.    This directly impacted John as Tedder failed to ensure that his teacher, Teacher 1, was exercising due care to ensure the health and safety of students in her classroom, and allowed John's classroom to devolve into crisis because Tedder, admittedly, had a hard time managing people who were older than her.

248.    As the Head of Lower School, in accordance with the NAIS Principles of Good Practice, Tedder was responsible for: i) "overseeing the shaping of the school's program and the quality of life in the school community"; and ii) "ensuring that every element of school life reflects the principles of equity, justice and the dignity of each individual." She failed to follow these principles.

249.    NAIS's Principles of Good Practice further require those who supervise teachers to: i) "lead[] faculty members in upholding high standards of professional behavior and respond[] immediately when behavior occurs that is harmful to children;" ii) ensure that new faculty members "receive orientation and support sufficient for them to work effectively and with

confidence that they are carrying out the educational mission, policies and procedures of the school"; and iii) ensure "that teachers are informed of both praise and criticism of their work" and provide "useful support and assistance…to improve the quality of teaching."

250.    Tedder failed to meet even these basic standards in supervising Teacher 1.

**C.  IMS Appointed A DEI Director Who Lacked Experience in the Role**

251.    In February 2023, for sudden and unclear reasons, the highly regarded Director of DEI immediately departed IMS, with no explanation to the community and no closure for the students she was actively mentoring. Her departure was deeply unsettling to many in the IMS community.

252.    Over the following months, the fact that the departure had been due to gross mismanagement by Soja emerged to the IMS community.

253.    In August 2023, Soja appointed a new Director of EIB (changing the title from DEI) from within IMS who was a highly respected teacher and coach but had no experience, training, or long term interest in leading DEI within an institution. He was also not allocated any time to complete this work in addition to teaching, coaching and residential life duties.

254.    NAIS Principles require the Head of School (*i.e.* Soja) to ensure "that diversity initiatives are coordinated and led by a designated individual…with the training, authority and support needed to influence key areas of policy development, decision making…and management."

255.    Soja's failure to appoint, or hire, an individual with the necessary experience and training to implement IMS's DEI policy left the IMS employees responsible for overseeing John's class without the proper guidance or supervision for ensuring that all students in the class were

treated in a non-discriminatory manner. Soja further failed to provide resources and support to the new director so that he could grow into his role.

### D.  **IMS Hired Teacher 1 Though She Lacked Necessary Experience and Training**

256.    In Spring 2023, Soja hired John's teacher, Teacher 1, without a competitive process.

257.     Teacher 1 had no experience teaching neurodiverse students and received no training from IMS in this regard.

258.    4 children out of 11 students in John's class were enrolled in IMS's Ascend program.

259.    Teacher 1 also lacked adequate experience with male students, as her previous teaching positions were primarily at highly academic schools for female students.

260.    Among other things, NAIS's Principles of Good Practice require teachers to: i) have "a thorough knowledge appropriate for his or her teaching assignments;" ii) stay "abreast of recent developments in the field;" iii) establish "positive relationships with students…characterized by mutual respect and good will"; and iv) model "integrity, curiosity, responsibility, creativity, and respect for all persons as well as an appreciation for racial, cultural, and gender diversity."

261.    Teacher 1 failed to meet even these basic standards.

**COUNT I**
**Disability Discrimination/Retaliation**
**Violations of the Americans With Disabilities Act**
**(Against Indian Mountain School)**

262.    Plaintiff incorporates by reference the facts alleged in each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

263.    The Americans With Disabilities Act ("ADA") extends its protections to private schools through Title III, prohibits discrimination "on the basis of disability" in "any place of public accommodation." 42 U.S.C. § 12182(a); 42 U.S.C. §§ 12181 *et. seq.*

264.   IMS is an "elementary, secondary, undergraduate, or postgraduate private school, or other place of education," which is a place of public accommodation pursuant to 42 U.S.C. § 12181(7)(J).

265.   John, who has dyslexia and ADHD, is a qualified individual with a "disability" as defined in the ADA. 42 U.S.C. § 12102.

266.   The following is a non-exhaustive list of the ways in which Defendant IMS discriminated against John in violation of the ADA by subjecting John to discipline because of his actual or perceived disabilities:

- John's teacher, Teacher 1, attributed his response to an assault as a product of John "feeling deeply," –sending a note home to his parents but not the female who attempted to bite John.

- John's teacher, Teacher 1, and Tedder, blamed John for his friends' conduct towards Student A, and repeatedly singled him out for discipline based on statements or behaviors that were attributable to his ADHD.

- John's teacher, Teacher 1, implemented a "behavioral plan" exclusively for John that required him to leave the classroom and stand in the hallway when he was being "disruptive." She did not apply the same rule to all students in the classroom. Teacher 1 was aware that John occasionally spoke in an overly direct way towards adults as part of his ADHD diagnosis.

- Tedder required John to apologize to a student that was aggressive towards him on in the playground shed. When disciplining John, Tedder referenced the ADHD reward plan implemented by John's parents, calling it a "behavior plan."

- Tedder and Soja repeatedly mischaracterized and reported John as being "rude" when he expressed his need for an accommodation or different teaching style due to his dyslexia.

- On January 18, 2024, John's parents complained to Tedder about the misconduct of John's teacher in the classroom and its impact on John's mental health. They asked for IMS to monitor the classroom environment. On January 21, 2024, John's parents told Tedder that they were not comfortable with John being in a mentally unhealthy learning environment without more adult direction. Tedder pointed to John—not his teacher—as the source of the problem.

267. The following is a non-exhaustive list of the ways in which Defendant IMS also retaliated against John:

- On January 18, 2024, John's parents complained to Tedder about the misconduct of John's teacher in the classroom and its impact on John's mental health. They asked for IMS to monitor the classroom environment. On January 21, 2024, John's parents told Tedder that they were not comfortable with John being in a mentally unhealthy learning environment without more adult direction. Tedder pointed to John—not his teacher—as the source of the problem.

- Despite glowing praise and progress reports over the course of the school year (including as late as January 15), on January 24, 2024, Tedder suddenly told John's cognitive behavioral therapist that IMS could no longer support John

- On January 25, 2024, Tedder and Soja mischaracterized the request for a safer classroom as a request for a second teacher that IMS could not accommodate. They then suggested that John withdraw from IMS. John's parents made clear that they

did not want to withdraw John from school and stated that they had requested an unspecified change in the classroom (not a second teacher), at the discretion of the school.

- On January 26, 2024, Tedder suddenly alleged that John had "issues with challenging behavior/classroom conduct" and said that IMS was unable to meet John's needs. Tedder and Soja attributed these fabricated issues to John's learning disabilities.

- On January 29, 2024, Tedder and Soja overexaggerated John's behavior at a basketball game and added on the "sledding incident" to try and back up the false assertion that IMS could not meet John's needs.

- On February 1, 2024, Tedder and Soja falsely accused John of a pattern of "physical aggression" that did not exist. They told John's parents that IMS would not offer John a re-enrollment contract and that John should expect to be expelled from IMS if he continued there and had any other behavioral issues.

- Tedder and Soja crafted a winter progress report that contained false statements about the level of support John needed, which portrayed him as a problematic student with behavioral, emotional and academic problems. They knew the report would become part of John's permanent record. They also wanted to prevent John from returning to IMS.

- Soja attempted to impose overly stringent conditions on John's possible return to IMS in the future and threatened John's expulsion in the event that his parents disagreed with IMS policies in the future.

268.    Defendant IMS singled out John and treated him differently than other "disruptive" students in his class, including students who punched, attempted to bite and were repeatedly unkind to fellow students, many of whom violated major school rules. Those students were not subject to the same reprimands as John and all of them still attend IMS.

269.    Tedder and Soja acted in bad faith and/or exercised gross misjudgment by fabricating a pattern of behavior that did not exist, attributing the conduct of other students to John, exaggerating the gravity of typical elementary school behaviors and attributing them to John's ADHD and mischaracterizing John's emotional distress from an unhealthy learning environment and angry teacher as a mental condition that could not be "supported."

270.    IMS also acted with deliberate indifference. Two of IMS's Board members were directly aware of the pressure placed on John's parents to withdraw John from IMS and the lack of evidence to support Tedder's and Soja's misrepresentations about John. They allowed John to be forced out of IMS.

271.    Soja, the Head of School, was aware of the discrimination and retaliation against John and actively participated in it rather than putting a stop to it.

272.    Tedder did not make Soja aware of physical evidence that directly contradicted the patterns of behavior Soja cited when pressuring John's parents to withdraw him from the school.

273.    IMS also subjected John to a hostile learning environment by allowing John to be subjected to repeated, unwarranted reprimands by his teacher, Teacher 1, and Tedder when the students responsible for bullying him received no discipline; singling John out for reprimands and forced apologies related to the misconduct of other students; subjecting John to comments like "dimwit" in the classroom; retaliating against John for complaining about the unhealthy learning environment; and forcing John's parents to withdraw him from school.

274.    As a result of the hostile learning environment created by IMS, John missed classes, altered his schedule, feared his time in the classroom, suffered acute emotional distress, had to increase and add medications and, ultimately, left school.

275.    IMS's violations of the ADA resulted in John's education records being permanently altered to falsely and erroneously reflect a history of disciplinary, emotional and academic issues which John does not have. These records continue to injure John's reputation. Accordingly, an injunction should issue directing IMS to: i) remove the winter progress report from John's file; ii) remove any other records, documents or correspondence from John's file which reflect behavioral or academic issues during the 2023-2024 school year; iii) issue a statement in response to inquiries from any other schools that John is in good standing and would be welcome to return to IMS at any time; and iv) issue a statement to agreed-upon members of the IMS community that unequivocally states that John did nothing wrong and was not expelled from IMS.

### COUNT II
#### Disability Discrimination/Retaliation
#### Violations of Section 504 of the Rehabilitation Act
#### 29 U.S.C. § 794 and Implementing Regulations
#### (Against Indian Mountain School)

276.    Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1-261 above as if fully set forth herein.

277.    Defendant IMS receives federal financial assistance. IMS's Form 990 for the fiscal year ending 2023 listed $417,798.00 in "government grants."

278.    John, who has dyslexia and ADHD, is a qualified individual with a "disability" as defined under Section 504 of the Rehabilitation Act, which incorporates the definition set forth in the Americans With Disabilities Act. *See* 29 U.S.C. § 705(9); 42 U.S.C. § 12102.

279.    The following is a non-exhaustive list of the ways in which Defendant IMS discriminated against John in violation of Section 504 of the Rehabilitation Act by subjecting John to discipline because of his actual or perceived disabilities:

- John's teacher, Teacher 1, attributed his response to an assault as a product of John "feeling deeply," –sending a note home to his parents but not the female who attempted to bite John.

- John's teacher, Teacher 1, and Tedder, blamed John for his friends' conduct towards Student A, and repeatedly singled him out for discipline based on statements or behaviors that were attributable to his ADHD.

- John's teacher, Teacher 1, implemented a "behavioral plan" exclusively for John that required him to leave the classroom and stand in the hallway  when he was being "disruptive." She did not apply the same rule to all students in the classroom. Teacher 1 was aware that John occasionally spoke in an overly direct way towards adults as part of his ADHD diagnosis.

- Tedder required John to apologize to a student that was aggressive towards him on in the playground shed. When disciplining John, Tedder referenced the ADHD reward plan implemented by John's parents, calling it a "behavior plan."

- Tedder and Soja repeatedly mischaracterized and reported John as being "rude" when he expressed his need for an accommodation or different teaching style due to his dyslexia.

- On January 18, 2024, John's parents complained to Tedder about the misconduct of John's teacher in the classroom and its impact on John's mental health. They asked for IMS to monitor the classroom environment. On January 21, 2024, John's parents

told Tedder that they were not comfortable with John being in a mentally unhealthy learning environment without more adult direction. Tedder pointed to John—not his teacher—as the source of the problem.

280. The following is a non-exhaustive list of the ways in which Defendant IMS also retaliated against John:

- On January 18, 2024, John's parents complained to Tedder about the misconduct of John's teacher in the classroom and its impact on John's mental health. They asked for IMS to monitor the classroom environment. On January 21, 2024, John's parents told Tedder that they were not comfortable with John being in a mentally unhealthy learning environment without more adult direction. Tedder pointed to John—not his teacher—as the source of the problem.

- Despite glowing praise and progress reports over the course of the school year (including as late as January 15), on January 24, 2024, Tedder suddenly told John's cognitive behavioral therapist that IMS could no longer support John

- On January 25, 2024, Tedder and Soja mischaracterized the request for a safer classroom as a request for a second teacher that IMS could not accommodate. They then suggested that John withdraw from IMS. John's parents made clear that they did not want to withdraw John from school and stated that they had requested an unspecified change in the classroom (not a second teacher), at the discretion of the school.

- On January 26, 2024, Tedder suddenly alleged that John had "issues with challenging behavior/classroom conduct" and said that IMS was unable to meet

John's needs. Tedder and Soja attributed these fabricated issues to John's learning disabilities.

- On January 29, 2024, Tedder and Soja overexaggerated John's behavior at a basketball game and added on the "sledding incident" to try and back up the false assertion that IMS could not meet John's needs.

- On February 1, 2024, Tedder and Soja falsely accused John of a pattern of "physical aggression" that did not exist. They told John's parents that IMS would not offer John a re-enrollment contract and that John should expect to be expelled from IMS if he continued there and had any other behavioral issues.

- Tedder and Soja crafted a winter progress report that contained false statements about the level of support John needed, which portrayed him as a problematic student with behavioral, emotional and academic problems. They knew the report would become part of John's permanent record. They also wanted to prevent John from returning to IMS.

- Soja attempted to impose overly stringent conditions on John's possible return to IMS in the future and threatened John's expulsion in the event that his parents disagreed with IMS policies in the future.

281.    Defendant IMS singled out John and treated him differently than other "disruptive" students in his class, including students who punched, attempted to bite and were repeatedly unkind to fellow students, many of whom violated major school rules. Those students were not subject to the same reprimands as John and all of them still attend IMS.

282.    Tedder and Soja acted in bad faith and/or exercised gross misjudgment by fabricating a pattern of behavior that did not exist, attributing the conduct of other students to John,

exaggerating the gravity of typical elementary school behaviors and attributing them to John's ADHD and mischaracterizing John's emotional distress from an unhealthy learning environment and angry teacher as a mental condition that could not be "supported."

283.    IMS also acted with deliberate indifference. Two of IMS's Board members were directly aware of the pressure placed on John's parents to withdraw John from IMS and the lack of evidence to support Tedder's and Soja's misrepresentations about John They allowed John to be forced out of IMS.

284.    Soja, the Head of School, was aware of the discrimination and retaliation against John and actively participated in it rather than putting a stop to it.

285.    Tedder did not make Soja aware of physical evidence that directly contradicted the patterns of behavior Soja cited when pressuring John's parents to withdraw him from the school.

286.    IMS also subjected John to a hostile learning environment by allowing John to be subjected to repeated, unwarranted reprimands by his teacher, Teacher 1, and Tedder when the students responsible for bullying him received no discipline; singling John out for reprimands and forced apologies related to the misconduct of other students; subjecting John to comments like "dimwit" in the classroom; retaliating against John for complaining about the unhealthy learning environment; and forcing John's parents to withdraw him from school.

287.    As a result of the hostile learning environment created by IMS, John missed classes, altered his schedule, feared his time in the classroom, suffered acute emotional distress, had to increase and add medications and, ultimately, left school.

288.    As a direct and proximate result of the above conduct, John sustained damages in an amount to be determined at trial, including loss of educational opportunities, reputational

damages, economic injuries and other direct and consequential damages. Plaintiffs are also entitled to recover attorneys' fees and costs.

289.    IMS's violations of Section 504 of the Rehabilitation Act resulted in John's education records being permanently altered to falsely and erroneously reflect a history of disciplinary, emotional and academic issues which John does not have. These records continue to injure John's reputation. Accordingly, an injunction should issue directing IMS to: i) remove the winter progress report from John's file; ii) remove any other records, documents or correspondence from John's file which reflect behavioral or academic issues during the 2023-2024 school year; iii) issue a statement in response to inquiries from any other schools that John is in good standing and would be welcome to return to IMS at any time; and iv) issue a statement to agreed-upon members of the IMS community that unequivocally states that John did nothing wrong and was not expelled from IMS.

### COUNT III
### Violation of Title VI of the Civil Rights Act of 1964
### (Against Indian Mountain School)

290.    Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1-261 above as if fully set forth herein.

291.    Title VI prohibits a recipient of federal funds from discriminating on the basis of race, color or national origin.

292.    Defendant IMS receives federal financial assistance. IMS's Form 990 for the fiscal year ending 2023 listed $417,798.00 in "government grants."

293.    IMS's Form 990 for the fiscal year ending 2023 states that IMS has a "racially nondiscriminatory policy towards students" and that it "does not discriminate by race in any way" with respect to its "educational policies."

294. IMS discriminated against John on the basis of his race by selectively enforcing a policy of "Ubuntu" or collective punishment which was utilized when Student A violated school rules but not when John did the same.

295. IMS discriminated against John on the basis of his race when it singled out John and disproportionately punished John for being "disruptive" in the classroom as compared to Student A, a person of color, who was also "disruptive" throughout the school year.

296. In response to Student A's disruptive behavior, John's teacher punished all the students in the class.

297. When John's teacher perceived John as being disruptive, she imposed harsh discipline on John alone.

298. IMS further discriminated against John on the basis of his race by falsely accusing John of being involved in a "racist" incident at recess when Student A was mistreated by other students in the class. John had no involvement in the incident.

299. IMS also discriminated against John on the basis of his race when Tedder and Soja escalated the sledding mishap to the level of an "incident" which comprised part of a false pattern of aggression they used to threaten John's expulsion and force his withdrawal from IMS.

300. Student A, who was the aggressor in the sledding mishap, received only a loss of sledding privileges during one recess and continued to attend IMS.

301. When speaking with John's mother, Tedder pointed out what a difficult year Student A was having—not John.

302. Prior to the sledding mishap, when John's mother reported to Soja that she had evidence of a pattern of bias against White, male students at IMS, Soja told her that White, male students should be more sensitive to the perspectives of others.

303.    John's false and defamatory winter progress report states that John needed support in the area of "[W]ork[ing] to be inclusive and welcoming to all."

304.    As a direct and proximate result of the above conduct, John sustained damages in an amount to be determined at trial, including loss of educational opportunities, reputational damages, economic injuries and other direct and consequential damages. Plaintiffs are also entitled to recover attorneys' fees and costs.

305.    IMS's violations of Title VI of the Civil Rights Act of 1964 resulted in John's education records being permanently altered to falsely and erroneously reflect a history of disciplinary, emotional and academic issues which John does not have. These records continue to injure John's reputation. Accordingly, an injunction should issue directing IMS to: i) remove the winter progress report from John's file; ii) remove any other records, documents or correspondence from John's file which reflect behavioral or academic issues during the 2023-2024 school year; iii) issue a statement in response to inquiries from any other schools that John is in good standing and would be welcome to return to IMS at any time; and iv) issue a statement to agreed-upon members of the IMS community that unequivocally states that John did nothing wrong and was not expelled from IMS.

**COUNT IV**
**Breach of Contract**
**(Against Indian Mountain School)**

306.    Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1-261 above as if fully set forth herein.

307.    The 2023-2024 enrollment contract was also a valid and enforceable contract between IMS and John.

308.    The Parent and Student Handbook was a valid and enforceable contract between IMS and John,

309.    John and his parents acted in good faith and fulfilled their obligations under each contract.

310.    IMS breached the 2023-2024 re-enrollment contract by denying John re-enrollment for the upcoming year, imposing conditions on John's possible continuation of his education  or re-enrollment at IMS in the future and forcing John's parents to withdraw him from school when there were no permissible grounds for taking those actions pursuant to the enrollment contract. *See* Paragraphs 203-217, *supra*.

311.    IMS breached the 2023-2034 Student and Parent Handbook by discriminating against John on the basis of his "disability," gender and race. *See* Paragraphs 218-233, *supra*.

312.    IMS also breached the 2023-2024 Student and Parent Handbook by denying re-enrollment to John, threatening to expel him if he stayed at IMS and forcing his parents to withdraw John from IMS because IMS never issued a behavioral contract for John nor was he placed on any form of probation at any point before Tedder and Soja forced John to leave school under threat. *See* Paragraphs 218-233, *supra*.

313.    IMS's actions were arbitrary, capricious and taken in bad faith because John received excellent progress reports, was graduating from the Ascend program and had no disciplinary record.

314.    Tedder and Soja fabricated a pattern of "aggressive behavior" that did not exist and forced John's parents to choose between possible expulsion from IMS or withdrawing from the school even though John's parents presented evidence to Soja that demonstrated that her assessment of the situation was incorrect.

315.    IMS's actions against John were also arbitrary, capricious and taken in bad faith because they were not based on facts but on a promise made by Tedder to Student A's parents that John was leaving school, even though Student A was the instigator of the sledding mishap.

316.    IMS breached the covenant of good faith and fair dealing in each contract by creating a set of unwritten rules for John and using those unwritten rules to impose disproportionate discipline on John, forcing him to leave school before the end of the 2023-2024 school year.

317.    IMS further breached the covenant of good faith and fair dealing in the enrollment contract by falsely claiming that John had mental health issues that IMS could neither support nor accommodate.

318.    Plaintiffs suffered economic losses, severe emotional distress and reputational harm as result of the direct, proximate, and foreseeable consequence of the foregoing breaches.

319.    Plaintiffs are entitled to damages in an amount to be determined at trial, plus prejudgment interest.

320.    IMS's breaches of the enrollment contract and Parent and Student Handbook resulted in John's education records being permanently altered to falsely and erroneously reflect a history of disciplinary, emotional and academic issues which John does not have. These records continue to injure John's reputation. Accordingly, an injunction should issue directing IMS to: i) remove the winter progress report from John's file; ii) remove any other records, documents or correspondence from John's file which reflect behavioral or academic issues during the 2023-2024 school year; iii) issue a statement in response to inquiries from any other schools that John is in good standing and would be welcome to return to IMS at any time; and iv) issue a statement to agreed-upon members of the IMS community that unequivocally states that John did nothing wrong and was not expelled from IMS.

**COUNT V**
**Negligence**
**(Against Indian Mountain School)**

321.    Plaintiffs repeats and realleges each and every allegation set forth in Paragraphs 1-261 above as if fully set forth herein.

322.    IMS owed John a duty to protect his health and safety while John was in IMS's care.

323.    IMS breached this duty when IMS employees, Teacher 1 and Tedder, repeatedly ignored the physically aggressive, bullying behavior of other students towards John including an attempted bite mark on John's arm, aggressive elbowing of John in class and a "bear hug" move during recess.

324.    In response to the bullying of John, Teacher 1 and Tedder imposed disproportionate punishment on John rather than the perpetrators.

325.    Tedder also allowed Teacher 2 to call John a "dimwit," without consequence and demanded that a 10-year-old boy learn to cope with this mistreatment.

326.    IMS further breached its duty to John by allowing Teacher 1 to exhibit hostile, "angry" behavior in the classroom, and to single out John for punishment as opposed to the collective punishment imposed on other students. At all times, IMS, through Tedder, was aware of these issues.

327.    As a result of IMS's breaches of its duty to protect John, he suffered acute emotional, psychological and physical harm, as well as economic losses.

328.    The harm suffered by John was a direct and foreseeable consequence of IMS's breaches of its duty to protect John

329.    As a direct and proximate result of the actions and omissions of IMS, Plaintiffs

suffered damages in an amount to be determined at trial, including financial losses, severe emotional distress and mental anguish.

330.    Plaintiffs are further entitled to an award of punitive damages because IMS acted with reckless indifference to John's rights as an IMS student.

331.    IMS's negligence resulted in John's education records being permanently altered to falsely and erroneously reflect a history of disciplinary, emotional and academic issues which John does not have. These records continue to injure John's reputation. Accordingly, an injunction should issue directing IMS to: i) remove the winter progress report from John's file; ii) remove any other records, documents or correspondence from John's file which reflect behavioral or academic issues during the 2023-2024 school year; iii) issue a statement in response to inquiries from any other schools that John is in good standing and would be welcome to return to IMS at any time; and iv) issue a statement to agreed-upon members of the IMS community that unequivocally states that John did nothing wrong and was not expelled from IMS.

### COUNT VI
### Negligent Hiring/Supervision/Retention
### (Against Indian Mountain School)

332.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1-261 above as if fully set forth herein.

333.    IMS owed a duty of care to its minor students, like John, to ensure their health and safety while they were in IMS's care.

334.    IMS had a duty to supervise John's teacher, Teacher 1, Teacher 2, Tedder and Soja because it knew, or should have known, that they were causing, or would cause, harm to John.

335.    IMS hired Tedder in 2022, and promoted her to the lower campus Head of School knowing that she lacked the requisite experience. Tedder admitted to John's parents that she lacked

experience managing "older" employees such as John's teacher, Teacher 1 Tedder was not provided with any training in administrative leadership prior to the 2023-24 school year.

336.    John's teacher, Teacher 1 also lacked the requisite experience and skill to manage John's classroom. On a number of occasions, Tedder, citing Soja, expressed that Teacher 1 lacked confidence and did not take criticism well.

337.    IMS also knew, because John's parents notified IMS Board members, that Tedder and Soja had engaged in threats and intimidation to force John's parents to withdraw him from school.

338.    IMS further knew, through Tedder, that John had been subjected to bullying, harassment and intimidation in the classroom and that he had been subjected to individualized, disproportionate punishment by a teacher who was angry all the time and made John fearful to attend school.

339.    John's parents also made multiple complaints to Tedder about John's classroom.

340.    Rather than take action to further prevent harm to John, IMS allowed the misconduct of John's teacher, Tedder and Soja to go unchecked.

341.    As a result of IMS's failure to adequately supervise John's teacher, Tedder and Soja, John suffered acute emotional distress, psychological and physical harm which arose from the hostile learning environment that he was subjected to and being forced out of IMS by Tedder and Soja.

342.    IMS was negligent in hiring Teacher 1, who lacked the requisite experience to teach John's class.

343.    IMS was negligent in retaining Teacher 2, who had a history at the school of bullying students.

344.    IMS was negligent in hiring and promoting Tedder because she was unqualified for the position.

345.    IMS was negligent in failing to operate with a trained Director of DEI/EIB in place during the 2023-24 school year.

346.    IMS was negligent in its promotion of an employee to the role of Director of Admissions who lacked the requisite experience and focused on "filling seats" as opposed to considering student needs.

347.    IMS was negligent in hiring, failing to supervise, and/or retaining, John's teachers, Teacher 1 and Teacher 2, Tedder and Soja.

348.    As a direct and proximate result of IMS's negligent supervision and retention of John's teacher, Teacher 1, J.Z, Tedder and Soja, Plaintiffs suffered damages in an amount to be determined at trial, including severe emotional distress, physical harm, and financial losses.

349.    Plaintiffs are further entitled to an award of punitive damages because IMS was reckless in its supervision of John's teacher, Teacher 1, Tedder and Soja and acted with reckless indifference to John's rights as an IMS student.

350.    IMS's negligence resulted in John's education records being permanently altered to falsely and erroneously reflect a history of disciplinary, emotional and academic issues which John does not have. These records continue to injure John's reputation. Accordingly, an injunction should issue directing IMS to: i) remove the winter progress report from John's file; ii) remove any other records, documents or correspondence from John's file which reflect behavioral or academic issues during the 2023-2024 school year; iii) issue a statement in response to inquiries from any other schools that John is in good standing and would be welcome to return to IMS at

any time; and iv) issue a statement to agreed-upon members of the IMS community that unequivocally states that John did nothing wrong and was not expelled from IMS.

## COUNT VII
### Intentional Infliction of Emotional Distress
### (Against Tedder and Soja)

351.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1-261 above as if fully set forth herein.

352.     Tedder and Soja knew, or should have known, that their course of conduct in fabricating a pattern of behavior and narrative that IMS could no longer "support" John would result in acute emotional distress, psychological and physical harm to John.

353.     Tedder and Soja also knew, or should have known, that using these fabrications to threaten John's expulsion if he remained at IMS and forcing John's parents to withdraw him from school would result in acute emotional distress, psychological and physical harm to John.

354.     John's cognitive behavioral therapist told Tedder that removing John from IMS would be detrimental to John's mental health.

355.     John's parents told Tedder and Soja that they were working with his cognitive behavioral therapist so that John could return to school.

356.     Tedder and Soja disregarded this information and escalated their campaign to oust John from IMS, ultimately causing his parents to withdraw John from school.

357.     Tedder and Soja also denied John any form of a transitional or reparative process—despite his parents' pleas for this assistance—to ease the impact of suddenly being forced to leave school and start over in a new school and community.

358.     Tedder and Soja exploited and exaggerated John's ADHD symptoms to create a false narrative about him that remains in his permanent education record.

359.     Tedder and Soja were hiding the fact that Tedder made false statements to Student A's parents that John was leaving school, though Student A was the cause of significant disruption in John's classroom and the aggressor in the sledding mishap.

360.     In the wake of Tedder's promise, she and Soja had to ensure that John left IMS.

361.     Tedder and Soja's concerted action to harm John was extreme and outrageous, exceeded all bounds usually tolerated by decent society and was especially calculated to cause the serious mental distress that John suffered as a result of being excluded from his school and community.

362.     As a result of being forced out of IMS, John suffers from acute emotional distress, and ongoing physical symptoms such as insomnia and nightmares.

363.     As a direct and proximate result of Tedder's and Soja's conduct, Plaintiffs are entitled to damages in an amount to be determined at trial.

364.     Because Tedder and Soja exhibited reckless indifference to John's rights, and/or intentionally and wantonly violated John's rights as a student at IMS, Plaintiffs are also entitled to an award of punitive damages.

### COUNT VIII
### Negligent Infliction of Emotional Distress
### (Against Tedder and Soja)

365.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1-261 above as if fully set forth herein.

366.     Tedder and Soja should have realized that their conduct in fabricating a pattern of behavior and narrative that IMS could no longer "support" John created an unreasonable risk of causing acute emotional distress, psychological and physical harm to John.

367.    Tedder and Soja also should have realized that using these fabrications to threaten John's expulsion if he remained at IMS and forcing John's parents to withdraw him from school created an unreasonable risk of acute emotional distress, psychological and physical harm to John.

368.    John's cognitive behavioral therapist told Tedder that removing John from IMS would be detrimental to John's mental health.

369.    John's parents told Tedder and Soja that they were working with his cognitive behavioral therapist so that John could return to school.

370.    Tedder and Soja disregarded this information and escalated their campaign to oust John from IMS, ultimately causing his parents to withdraw John from school.

371.    Tedder and Soja also denied John any form of a transitional or reparative process—despite his parents' please for this assistance—to ease the impact of suddenly being forced to leave school and start over in a new school and community.

372.    Tedder and Soja exploited and exaggerated John's ADHD symptoms to create a false narrative about him that remains in his permanent education record.

373.    Tedder and Soja were hiding the fact that Tedder made false statements to Student A's parents that John was leaving school, though Student A was the cause of significant disruption in John's classroom and the aggressor in the sledding mishap.

374.    In the wake of Tedder's promise, she and Soja had to ensure that John left IMS.

375.    As a result of being forced out of IMS, John suffers from acute emotional distress, and ongoing physical symptoms such as insomnia and nightmares.

376.    As a direct and proximate result of Tedder's and Soja's conduct, Plaintiffs are entitled to damages in an amount to be determined at trial.

377.     Because Tedder and Soja exhibited reckless indifference to John's rights, and/or intentionally and wantonly violated John's rights as a student at IMS, Plaintiffs are also entitled to an award of punitive damages.

**COUNT IX**
**Defamation**
**(Against IMS, Tedder and Soja)**

378.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1-261 above as if fully set forth herein.

379.     On or about February 23, 2024, Tedder, upon information and belief, drafted a winter progress report about John which contained the following false and defamatory statements:

- John "needs ongoing support in school to monitor his impulses."

- That John "requires support" for:

    i.   Accepting responsibility for personal behavior

    ii.  Exhibiting empathy and care for others

    iii. Acting with integrity and seeking to improve the community

    iv.  Working to be inclusive and welcoming to all

- John can be "overwhelmed and impulsive when he is upset or perceives something to be unfair…his reaction can result in conflicts with other students."

380.     Tedder knew that the statements made in the report were false or acted in reckless disregard of their truth or falsity.

381.     Tedder drafted and published the report to IMS's electronic student records system, then downloaded and shared a copy with Soja.

382.     Soja then emailed the report to John's parents.

383.   On or about the time that Soja emailed the report to John's parents, she knew that the above statements were false, or acted in reckless disregard of their truth or falsity.

384.   Tedder wrote, and Soja reviewed, the report with the intention that it would be a part of John's record at IMS and would be shared with John's new school.

385.   IMS, Tedder and Soja conspired to defame John in order to further their false narrative that John had disciplinary problems that could no longer be supported by IMS.

386.   The false and defamatory winter progress report caused John to suffer reputational harm and severe mental anguish.

387.   IMS, Tedder and Soja acted with actual malice and, accordingly, Plaintiffs are also entitled to an award of punitive damages.

388.   Because the false and defamatory winter progress report remains a part of John's education records, it is likely to cause continuing harm to his reputation. Accordingly, an injunction should issue directing IMS to: i) remove the winter progress report from John's file; ii) remove any other records, documents or correspondence from John's file which excerpt, refer to or cite the winter progress report; iii) issue a statement in response to inquiries from any other schools that John is in good standing and would be welcome to return to IMS at any time; and iv) issue a statement to agreed-upon members of the IMS community that unequivocally states that John did nothing wrong and was not expelled from IMS.

389.   Plaintiffs also seek an injunction directing Tedder and Soja to issue letters of apology to John.

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

i.    On the first count, against Indian Mountain School for violations of the Americans With Disabilities Act, an injunction directing IMS to: i) remove the winter progress report from John's file; ii) remove any other records, documents or correspondence from John's file which reflect behavioral or academic issues during the 2023-2024 school year; iii) issue a statement in response to inquiries from any other schools that John is in good standing and would be welcome to return to IMS at any time; and iv) issue a statement to agreed-upon members of the IMS community that unequivocally states that John did nothing wrong and was not expelled from IMS, plus attorneys' fees and costs.

ii.    On the second count, against Indian Mountain School for violations of Section 504 of the Rehabilitation Act, damages in an amount to be determined at trial, plus attorneys' fees and costs; and an injunction directing IMS to: i) remove the winter progress report from John's file; ii) remove any other records, documents or correspondence from John's file which reflect behavioral or academic issues during the 2023-2024 school year; iii) issue a statement in response to inquiries from any other schools that John is in good standing and would be welcome to return to IMS at any time; and iv) issue a statement to agreed-upon members of the IMS community that unequivocally states that John did nothing wrong and was not expelled from IMS.

iii.    On the third count, against Indian Mountain School, for violations of Title VI of the Civil Rights Act of 1964, damages in an amount to be determined at trial, plus attorneys' fees and costs; and an injunction directing IMS to: i) remove the winter progress report from John's file; ii) remove any other records, documents or correspondence from John's file which reflect behavioral or academic issues during the

2023-2024 school year; iii) issue a statement in response to inquiries from any other schools that John is in good standing and would be welcome to return to IMS at any time; and iv) issue a statement to agreed-upon members of the IMS community that unequivocally states that John did nothing wrong and was not expelled from IMS.

iv.   On the fourth count, against Indian Mountain School, for breach of contract/breach of the covenant of good faith and fair dealing, damages in an amount to be determined at trial, plus prejudgment interest; and an injunction directing IMS to: i) remove the winter progress report from John's file; ii) remove any other records, documents or correspondence from John's file which reflect behavioral or academic issues during the 2023-2024 school year; iii) issue a statement in response to inquiries from any other schools that John is in good standing and would be welcome to return to IMS at any time; and iv) issue a statement to agreed-upon members of the IMS community that unequivocally states that John did nothing wrong and was not expelled from IMS.

v.   On the fifth count, against Indian Mountain School, for negligence, damages in an amount to be determined at trial, punitive damages, and an injunction directing IMS to: i) remove the winter progress report from John's file; ii) remove any other records, documents or correspondence from John's file which reflect behavioral or academic issues during the 2023-2024 school year; iii) issue a statement in response to inquiries from any other schools that John is in good standing and would be welcome to return to IMS at any time; and iv) issue a statement to agreed-upon members of the IMS community that unequivocally states that John did nothing wrong and was not expelled from IMS.

vi.  On the sixth count, against Indian Mountain School, for negligent hiring, supervision, or retention, damages in an amount to be determined at trial, punitive damages, and an injunction directing IMS to: i) remove the winter progress report from John's file; ii) remove any other records, documents or correspondence from John's file which reflect behavioral or academic issues during the 2023-2024 school year; iii) issue a statement in response to inquiries from any other schools that John is in good standing and would be welcome to return to IMS at any time; and iv) issue a statement to agreed-upon members of the IMS community that unequivocally states that John did nothing wrong and was not expelled from IMS.

vii.  On the seventh count, against Amy Tedder and Jody Soja for intentional infliction of emotional distress, damages in an amount to be determined at trial, and punitive damages.

viii.  On the eighth count, against Amy Tedder and Jody Soja for negligent infliction of emotional distress, damages in an amount to be determined at trial, plus punitive damages.

ix.  On the ninth count, against IMS, Amy Tedder and Jody Soja for defamation and conspiracy to defame, damages in an amount to be determined at trial, punitive damages, and an injunction directing IMS to: i) remove the winter progress report from John's file; ii) remove any other records, documents or correspondence from John's file which excerpt, refer to or cite the winter progress report; iii) issue a statement in response to inquiries from any other schools that John is in good standing and would be welcome to return to IMS at any time; and iv) issue a statement to agreed-upon members of the IMS community that unequivocally states that John did nothing wrong

and was not expelled from IMS. Plaintiffs further seeks an injunction directing Tedder and Soja to write letters of apology to John.

x.    Such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  August 29, 2024

               /s/ *Christine D. Brown*
               Christine D. Brown (Bar No. 20790)
Kara L. Gorycki (*pro hac vice admission pending*)
Andrew T. Miltenberg (*pro hac vice admission pending*)
NESENOFF & MILTENBERG, LLP.
363 Seventh Avenue, Fifth Floor
New York, New York 10001
Telephone:(212)736-4500
cbrown@nmllplaw.com
kgorycki@nmllplaw.com
amiltenberg@nmllplaw.com